Penn Needle Art Company v. Commissioner.
Penn Needle Art Co. v. Commissioner
Docket No. 62037.
United States Tax Court
T.C. Memo 1958-99; 1958 Tax Ct. Memo LEXIS 131; 17 T.C.M. (CCH) 504; T.C.M. (RIA) 58099; May 28, 1958
Jerome C. Bachrach, Esq., Farmers Bank Building, Pittsburgh, Pa., and Sidney Hoffman, Esq., for the petitioner. Gerald Backer, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner made the following determination of deficiencies against petitioner: Accumulated Earnings Tax
under sec. 102 I.R.C. 1939
Year Ended
Income Tax
and sec. 531 I.R.C. 1954
June 30, 1953
$ 9,009.19
June 30, 1954
$ (61.91) Overassessment
12,395.66
June 30, 1955
5,179.20
23,829.96
Two questions are presented for decision. First, was petitioner availed of for *132 the purpose of preventing the imposition of income tax upon its shareholders in fiscal years ended June 30, 1954 and 1955? (The Commissioner conceded that petitioner did not do so in fiscal 1953.) Second, did the Commissioner properly disallow as a deduction part of the $31,400 paid to petitioner's president as compensation for its fiscal year ended June 30, 1955? Findings of Fact The stipulated facts are found as stipulated. Petitioner is a Pennsylvania corporation organized in 1946. It is engaged in the manufacture of curtains and draperies. Its tax returns for the years involved were filed with the director of internal revenue for the Pittsburgh, Pennsylvania internal revenue district. Petitioner is on an accrual method of accounting and reports for income tax purposes on the basis of a fiscal year ending each June 30. Unreasonable Accumulation of Earnings Issue Two hundred and fifty shares of petitioner's capital stock were issued to Leo and Serena Berger, the consideration for which was the payment of $25,000 by them to petitioner. Said $25,000 was recorded as a loan when received and then converted into capital stock. Two hundred and fifty shares of petitioner's *133 stock were issued to Leon and Esther Gottlieb in partial consideration for their contributing certain assets of their predecessor partnership. During the years here involved, petitioner's officers, directors, and stockholders (prior to the purchase of the Gottliebs' shares) were as follows: Outstanding shares
Leon Gottlieb, President and Treasurer
187 1/2 shares
37 1/2%
Esther Gottlieb (Leon's wife)
62 1/2 shares
12 1/2%
Leo Berger, Secy. and General Manager
125 shares
25%
Serena Berger (Leo's wife)
125 shares
25%
Total
500
100%
Esther Gottlieb and Serena Berger were not at any time actively en-
gaged in the affairs of petitioner.
Petitioner's net sales, income before and after Federal income taxes, and compensation paid to officers, from its incorporation through its most recently completed fiscal year, are as follows (cents ommitted): Income
Total
Fiscal
Taxable
Federal
Less
Officers'
Leo
Leon
In-
Year
Net Sales
Income
come Tax
Tax
Compensation
Berger
Gottlieb
Ended
6-30-47
$ 251,075
$ 17,006
$ 3,811
$13,195
$15,600
$ 7,800
$ 7,800
6-30-48
426,135
27,589
7,122
20,467
19,800
9,900
9,900
6-30-49
478,989
10,073
2,216
7,857
24,000
12,000
12,000
6-30-50
1,024,726
78,451
29,811
48,640
24,000
12,000
12,000
6-30-51
951,031
29,468
8,350
21,118
24,000
12,000
12,000
6-30-52
833,393
31,843
11,058
20,785
26,400
13,200
13,200
6-30-53
962,114
56,793
24,032
32,761
27,700
14,500
13,200
6-30-54
957,702
82,567
37,434
45,133
29,000
15,800
13,200
6-30-55
1,382,191
159,111
77,238
81,873
44,600
31,400
13,200
6-30-56
1,148,901
52,928
22,022
30,906
31,400
31,400
6-30-57
1,033,133
25,607
7,815
17,792
28,000
28,000
*134 Petitioner made bank loans as follows:
Date
Bank
Amount
Sept. 8, 1950
Peoples First National Bank & Trust Company
$50,000
Aug. 1, 1951
Washington Trust Company
72,000
Apr. 16, 1952
Washington Trust Company
10,000
Oct. 21, 1952
Washington Trust Company
25,000
Nov. 18, 1952
Washington Trust Company
25,000
The above loans were all repaid by June 30, 1953. During the fiscal years
ended June 30, 1954 and June 30, 1955, petitioner made no bank loans.
Petitioner's balance sheets at the end of the first, sixth, and twelfth months of each of the two fiscal years here involved were as follows: Fiscal Year Ended June 30, 1954
Assets
7-31-53
12-31-53
6-30-54
Cash
$ 34,613.70
$ 78,368.47
$ 96,388.78
Accounts
and notes
receivable
58,281.75
79,650.98
89,109.38
Inventory
189,966.00
141,617.00
102,371.94
Other assets
16,409.92
17,490.78
17,361.31
Total Assets
$299,271.37
$317,127.23
$305,231.41
Liabilities
$ 90,936.71
$ 81,282.40
$ 49,535.75
Net Worth
208,334.66
235,844.83
255,695.66
Total
$299,271.37
$317,127.23
$305,231.41
Fiscal Year Ended June 30, 1955
Assets
7-31-54
12-31-54
6-30-55
Cash
$ 51,879.45
$169,143.32
$108,242.36
Accounts
and notes
receivable
88,712.51
102,260.55
95,238.10
Inventory
270,156.00
226,516.00
77,489.89
Other assets
18,427.03
29,437.36
14,175.71
Total Assets
$429,174.99
$527,357.23
$295,146.06
Liabilities
$173,172.89
$221,673.01
$208,105.64
Net Worth
256,002.10
305,684.22
87,040.42
Total
$429,174.99
$527,357.23
$295,146.06
*135 Petitioner's net liquid assets (excess of cash over current liabilities), working capital (excess of current assets (except inventory) over current liabilities), operating expenses included among "Deductions" for one year, operating expenses included in "Cost of Goods Sold" for one year, and average inventories and receivables were as follows: Fiscal Year 1954
July 31,
Dec. 31,
June 30.
1953
1953
1954
Net liquid assets
* $ (56,323.01)
$ (2,913.93)
$ 46,853.03
Working capital excluding
1,958.74
76,737.05
135,962.41
inventory
Operating expenses (in
166,566.65
Deductions)
Operating expenses (in Cost of
89,287.69
Goods Sold)
Average accounts receivable
90,275.69
during year
Average inventory during year
168,383.41
Fiscal Year 1955
July 31,
Dec. 31,
June 30,
1954
1954
1955
Net liquid assets
[121,293.44)
[62,529.69)
[99,863.28)
Working capital excluding
(32,580.93)
39,730.86
(4,625.18)
inventory
Operating expenses (in
238,690.22
Deductions)
Operating expenses (in Cost of
123,007.51
Goods Sold)
Average accounts receivable
116,418.93
during year
Average inventory during year
158,608.41
*136 The June 30 balance sheet of a curtain and drapery manufacturer does not represent the normal financial position of such a business. The slowest time for such a business generally takes place around that month and petitioner was no exception. At June 30, 1954 and June 30, 1955, petitioner had commitments for future deliveries of merchandise. These contingent liabilities were not reflected on its balance sheets. Petitioner's balance sheet at June 30, 1955, and its income figure for the year then ended, included approximately $28,000 of inventory and receivables (arising from industrial advertising orders) which were never realized. About $450,000 of petitioner's fiscal 1955 sales, and $60,000 of its taxable income in that year were attributable to two Gulf Oil Corporation orders secured July 7, 1954 and January 10, 1955, calling for the manufacture of 7,200,000 plastic pennants. Petitioner has never before or since received similar orders and had no expectation of receiving these two prior to July 1954. At June 30, 1955, petitioner's machinery was obsolete and antiquated. Petitioner's sewing machines were linked under single shaft arrangements as compared *137 to modern single table operations. The machines had neither automatic hammers nor automatic stops for thread breakage. Modernization and replacement of petitioner's machinery and equipment in 1955 would have cost at least $40,000. Since its incorporation, and during the years here involved, petitioner carried on its manufacturing business in a building at 1208 Forbes Street, Pittsburgh, Pennsylvania, owned by Leon Gottlieb. Petitioner paid Gottlieb $250 per month rent. Beginning with the fiscal year ended June 30, 1954, it also rented a storeroom on Magee Street. Petitioner's rented factory space on Forbes Street included 14,500 square feet, made up of 8,500 square feet on the main floor and 6,000 square feet of wooden balconies. Conditions in the Forbes Street plant were inefficient, crowded, dangerous, and unsanitary. Petitioner's labor union had made representations about inadequate shop conditions. Fifty girls had no place to eat lunch except at the sewing machines. Petitioner did not have the female lavatory facilities required by law. The trend in petitioner's industry is to one-floor plant operations. Petitioner's officers were aware of the conditions in their plant. *138 They knew their competitors were putting up modern onefloor buildings. Prior to ascertaining the results of the profitable Gulf orders their corporation's cash position did not permit them to adopt definite expansion plans. They did inspect one building in the fall of 1954, offered to them by a real estate broker. During the years involved, petitioner would have required 30,000 square feet to house its operations in modern fashion. A simple concrete block, one-floor building, having 30,000 square feet, suitable for light industrial use, located in the Pittsburgh metropolitan area, plus land, would have cost from $230,000 to $250,000. Prior to February 1955, neither Berger nor Gottlieb had any expectation of severing their business relationship. In February 1955, Gottlieb and Berger had a serious dispute. As a result Berger informed Gottlieb that the corporation would have to buy one or the other's shares. On May 4, 1955, Berger offered to sell his shares in petitioner for their book value which at April 30, 1955, was $176,000 or about $706 per share. This offer was not accepted. By agreement dated June 15, 1955, petitioner purchased for $250,000 its 250 shares owned by Leon *139 and Esther Gottlieb. The $250,000 consideration was paid $150,000 in cash on June 15, 1955, and $100,000 at the rate of $5,000 per month for 20 months. On June 15, 1955, petitioner recorded this purchase on its books as Treasury Stock. The payment of $250,000 to the Gottliebs so reduced the corporation's cash that its credit was impaired and it was no longer able to make advantageous merchandise purchases nor anticipate its bills. Since 1955 it has been able to buy but one new machine. It has purchased a number of used machines as replacements. Berger was not financially able to buy the Gottliebs' shares and never offered to do so. Gottlieb would not have considered a personal offer by Berger. Berger was aware of the Internal Revenue Code sections dealing with improper accumulations of surplus. At several undisclosed times he discussed petitioner's dividend policies with its lawyers and each time came to the conclusion that the corporation had to conserve its funds to replace its machinery, and eventually move to a more efficient plant. Berger did not plan to have petitioner accumulate surplus so that it would be able to buy out Gottlieb. He did not intend to use petitioner *140 to avoid his personal income taxes. Petitioner never lent money to its shareholders, nor did it ever make investments outside of its business unless the purchase of the Gottlieb stock can be so characterized. It paid no dividends. Petitioner on November 17, 1954, placed $100,000 in a savings account and made no withdrawals from this account through the 7 1/2 months remaining in the fiscal year ended June 30, 1955. If petitioner had paid out in dividends its entire income after taxes in fiscal years ended June 30, 1954 and 1955, its shareholders would have had additional personal income tax liability as follows: Leon and
Leo and
Year
Esther Gottlieb
Serena Berger
1954
$13,434.88
$ 8,803.76
1955
23,662.78
21,624.85
Petitioner was not a holding or investment company. At June 30, 1954 and at June 30, 1955, petitioner's earnings and profits had not accumulated beyond the reasonable needs of its business. Petitioner was not availed of during the periods here involved for the purpose of preventing surtax upon its shareholders by permitting its earnings and profits to accumulate beyond the reasonable needs of its business instead of being distributed. *141 Compensation Issue Leo Berger was born in Czechoslovakia and attended college in Bratislava. From 1925 to 1935 he managed a barley export company. From 1935 until 1939 he directed a plant with 250 employees manufacturing margarine and vegetable oil. During this period he was selected by the Slovakian margarine industry to represent it in negotiations with the Czechoslovakian Government. In April 1939, when the Nazis invaded Czechoslovakia, Berger had to leave the country. He came to the United States penniless and unable to speak English. In May 1939, Gottlieb hired Berger as a janitor at $15 per week. He rose rapidly to full management of the business. In 1946 petitioner's predecessor partnership paid Berger $22,817.28 in compensation. Gottlieb then approached Berger to become an equal shareholder in the new corporation. During fiscal 1954 and 1955 Berger was in full charge of managing petitioner's business. He was the purchasing agent, he was in charge of sales, and of production. He personally handled petitioner's larger accounts in fiscal 1955. He received no sales commissions. Petitioner paid an average 3 1/2 per cent commission on sales made by its other salesmen, one *142 of whom made $20,000 in 1955. Petitioner had no executives other than Berger and Gottlieb. The latter was largely inactive in the business, being primarily concerned with his real estate investments. A competitor of petitioner, making the same products, located in the same general area, doing $3,000,000 sales volume annually but operating at little or no profit, paid a total of $40,000 annually during the years in question to its two executives in charge of production and sales. This competitor also pays its officers a bonus based on earnings. Other companies in petitioner's industry compensate their executives under a bonus arrangement based on profits. Berger had no assistant. He has had no vacation since 1950. Gottlieb was willing to hire an assistant for Berger at $5,200 to $7,800 per year, without reducing Berger's salary. Berger felt petitioner could not afford to hire a qualified assistant. Berger received employment offers from other curtain and drapery manufacturers involving $25,000 per year plus bonus. Berger successfully solved the problems posed by the Gulf Oil Corporation orders referred to above, including buying raw materials, arranging another shift, and coordinating *143 production. Petitioner's sales representative received approximately $60,000 as his one-half share of the profits earned on the Gulf orders. Petitioner's mechanic received a $2,000 bonus for his extra work in connection with these orders. After taking physical inventory on June 30, 1955, and determining what the actual profit for the fiscal year then ended amounted to, petitioner accrued a $15,600 bonus to Berger. He reported the full $31,400 in his 1955 individual income tax return. Respondent disallowed as a deduction $10,333 of said bonus. The $31,400 payment constituted reasonable compensation to Berger. Opinion Unreasonable Accumulation of Earnings Issue Had petitioner progressed with definite and specific plans for modernizing its plant and equipment, the need for which the record amply sustains, we think this issue could readily be decided for petitioner. . But the lack of definite plans does not necessarily mean the petitioner must lose the issue. . Here the record discloses what we believe is another compelling reason for the accumulation of earnings which took *144 place, i.e., the need for substantial amounts of working capital. How much working capital a particular petitioner needs is a question which must be answered with an eye to the particular facts of each case and to some extent depends upon the application of business judgment which, in the first instance is a task for the officers and directors of the corporation. . The Commissioner argues that since the accumulated earnings of petitioner were used to purchase the stock of one of the controlling shareholders, it follows that the money was not needed for the business. This is not necessarily so. The trouble between Gottlieb and Berger came about suddenly and the decision to have the corporation buy the shares rather than resort to some other alternative for acquiring them, was not the result of some long term planning or a desire to distribute earnings to Gottlieb at capital gains rates, but so far as we can determine from the record, was a decision made in an exigency after consideration of several possibilities. See . No tax avoidance scheme was involved. *145 That the earnings which were used to purchase the stock would otherwise have been useful in the business can, inferentially at least, be drawn from hindsight. Petitioner's credit standing suffered and its sales and earnings fell in the two ensuing years. Contrary to the Commissioner's argument that Berger deliberately contrived the accumulation of earnings for the purpose of having petitioner buy out Gottlieb, we think the earnings were accumulated because of the needs of the business, and not unreasonably so. . This issue has been decided after consideration of the record as a whole and without particular attention to questions as to where the burden of proof lay. See ; Compensation Issue Our Finding of Fact disposes of this issue. Decision will be entered under Rule 50. Footnotes
*. ( ) in red ink.↩